IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

WILLIAM HENDERSON,                )
                                  )
              Plaintiff,          )
                                  )
       v.                         )   Case No. 05-3327-CV-S-REL
                                  )
JO ANNE BARNHART, Commissioner    )
of Social Security,               )
                                  )
              Defendant.          )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, William Henderson, seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for a period of disability and
disability insurance benefits under Titles II and XVI of the
Social Security Act ("the Act").  Plaintiff raises the
following questions:

1.    Did the ALJ properly assess plaintiff's
      credibility and the opinion of David Paff, M.D.?

2.    Did the ALJ properly formulate plaintiff's
      residual functional capacity (RFC)?

3.    Did the ALJ properly question the vocational
      expert ("VE") at the administrative hearing?

4.    Did the ALJ properly conduct a credibility
      evaluation as required by Polaski v. Heckler, 739
      F.2d 1320 (8th Cir. 1984)?

I find that ALJ did not err in evaluating plaintiff's
claim.  Therefore, plaintiff's motion for summary judgment

will be denied and the decision of the Commissioner will be affirmed.

## I.    *BACKGROUND*

This suit involves two applications made under the Social Security Act ("the Act"): the first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq (Tr. 50-53); and the second is an application for supplemental security income ("SSI") benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq (Tr. 224-27).

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II.  Section 1631(c)(3) of the Act, 42 U.S.C. § 1383 (c)(3), provides for judicial review under Title XVI, to the same extent as the Commissioner's final determination under section 205.

Plaintiff's applications were denied on April 21, 2004 (Tr. 32-40, 231-35).

On March 16, 2005, following a November 10, 2004, evidentiary hearing, an administrative law judge ("ALJ") rendered a decision in which she found that plaintiff was not under a "disability" as defined in the Act (Tr. 13-26).

On May 27, 2005, the Appeals Council of the Social
Security Administration denied plaintiff's request for
review (Tr. 6-8). Thus, the decision of the ALJ stands as
the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides
for judicial review of a "final decision" of the
Commissioner. The standard for judicial review by the
federal district court is whether the decision of the
Commissioner was supported by substantial evidence. 42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401
(1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir.
2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);
Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The
determination of whether the Commissioner's decision is
supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision. Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan,
876 F.2d 666, 669 (8th Cir. 1989). "The Court must also
take into consideration the weight of the evidence in the
record and apply a balancing test to evidence which is
contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th

3

Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of

4

substantial gainful activity in the national economy that
the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853,
857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974
(W.D. Mo. 2000).

The Social Security Administration has promulgated
detailed regulations setting out a sequential evaluation
process to determine whether a claimant is disabled.  These
regulations are codified at 20 C.F.R. §§ 404.1501, et seq.
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

1.    Is the claimant performing substantial gainful
      activity?

            Yes = not disabled.
            No = go to next step.

2.    Does the claimant have a severe impairment or a
      combination of impairments which significantly
      limits his ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.    Does the impairment meet or equal a listed
      impairment in Appendix 1?

            Yes = disabled.
            No = go to next step.

4.  Does the impairment prevent the claimant from
    doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to
        Commissioner.

5.  Does the impairment prevent the claimant from
    doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff,
plaintiff's wife, and a vocational expert, Michael Lala, in
addition to documentary evidence admitted at the hearing.[1]

A summary of the defendant's background, medical
problems and complaints is contained within the report
prepared by David G. Paff, M.D.:

> William Henderson is a 48-year-old gentleman[2] seen on
> this date for evaluation of disability in regard to
> application for Social Security.
>
> Patient states he is from Connecticut and Maine.  He
> did go to the eleventh grade in school, dropped out,
> and then did get a GED.  He has had other schooling,
> which is a nine-month-course in a technology school
> beginning in 2002 and ending in 2003 in diesel
> technology.  He states he graduated first in his class.
> He had been working at Rawlings in Ava in the warehouse

---

[1]The factual record is largely a matter of stipulation
between the parties.  See Brief for Defendant, document 14,
page 2.

[2]Plaintiff is now age 50 (Tr. 243).

6

for 5 ½ years.  Subsequent to that the company shut
down, and he got a government grant to go to school.
One month before finishing school, he had an accident.
He was off work for two weeks and then went back and
wrote an essay to make up for his missed time, and he
did graduate.  He has not been able to work since then
because of the accident.  On April 28, 2003, he was on
an extension ladder in the classroom and someone else
was holding the ladder.  He was 15 feet up in the air
and the ladder slipped, and he fell on the concrete
floor, landing on his left heel and left elbow.  He did
not have an injury to the left elbow, but he did have a
crushed calcaneal bone in the left heel.  He states he
was treated with an Ace bandage and then they talked
about doing surgery, but decided against it.  He had a
cast and then a walking boot, an insert in his shoe,
and finally a brace.  He had four months of physical
therapy.  He was treated by Dr. Hubbard, an orthopedist
in West Plains.  He was seen also by Dr. McShane for a
second opinion, who suggested that he wait as long as
he can to have a fusion, as he will be laid up for
quite a while after the fusion.  Patient states he
still gets some discoloration at times.  Cold or humid
weather causes increase in pain.  He does have pain all
of the time, however, even without weightbearing.  He
wears a brace constantly, which helps hold his foot up
in a normal position.  He can stand for 15 minutes and
walk about 200 feet.  If he walks on something soft,
like carpet, it is not as painful.  Walking on rough
ground makes it worse.  He has a lot of weakness in the
leg and atrophy of the gastrocnemius muscle.

Patient states that he had an accident in 1990 with a
motorcycle and fracture at C1 and C2.  He was not
expected to live, but he did, and he had a fusion in
2001 . . . at C4-5.

(Tr. 218.)


**A.    _ADMINISTRATIVE REPORTS_**

     The record contains the following administrative

reports:

7

Plaintiff protectively filed his applications for disability benefits under Title II and Title XVI, on March 2, 2004 (Tr. 50-53, 224-30). He stated that he was born in 1956, and alleged that he became disabled beginning April 28, 2003 (Tr. 50, 224).

In his February 29, 2004, Disability Report, plaintiff alleged disability due to a shattered heel, broken neck, and a blood clot in his lung (Tr. 64-73). He reported that these conditions affected his ability to stand and walk due to the severe pain in his ankle and to having "limited ability to turn [his] head" (Tr. 65). Plaintiff reported that he stopped working on September 15, 2001, when "Rawling's closed" and he returned to school to get his GED and training as a diesel technician (Tr. 65). It was there that he fell off a ladder and shattered his heel and ankle, although he was still able to graduate from school (Tr. 65).

In plaintiff's earnings record, he shows the following income for the years indicated:

| 1972 | 884.80 |
|------|--------|
| 1973 | 2,333.56 |
| 1974 | 2,181.75 |
| 1975 | 762.03 |
| 1976 | 2,973.87 |
| 1977 | 5,950.31 |
| 1978 | 7,474.33 |
| 1979 | 11,036.60 |
| 1980 | 11,866.53 |

```
1981        15,803.68
1982         2,059.46
1983        16,345.31
1984        19,185.82
1985        22,324.95
1986        11,355.43
1987        11,193.96
1988        17,613.45
1989        18,798.79
1990         1,813.38
1991         1,927.10
1992         2,977.96
1993            80.00
1994         4,651.76
1995         4,826.25
1996        10,260.25
1997        15,748.80
1998        17,318.04
1999        17,318.04
2000        17,596.29
2001         9,348.44
```

(Tr. 55.)

In plaintiff's March 14, 2004, work history report, he showed the following employment for the years indicated:

    1990      Emerson as factory worker.
    1991-92   Crestview as CNA in nursing home.
    1993      Hodgens Mill as factory worker.
    1994      Superior Steel as factory worker.
    1995      Townsend Tree Service as a trimmer.
    1996-01   Rawlings Sporting Goods as factory worker.

(Tr. 78.)  In the remarks section of the report, plaintiff observed in part:

    When it rains or when it is cold outside my neck
    stiffen's (sic) making it difficult to turn my head so
    I have to turn my whole body it also make's (sic) my
    foot and ankle hurt for which I take pain pills.

(Tr. 85.)

9

On March 14, 2004, plaintiff responded to questions posed by the agency concerning his condition and its implications (Tr. 86-90).  The questions and answers (answers shown in bold), in part, reflect the following:

2.   What is the medical condition(s) that keeps you from working?

     **Shattered heel and ankle.** (Tr. 86.)

3.   Describe the symptoms that keep you from working?

     **Severe pain when on feet for any len[g]th of time[.]** (Tr. 86.)

4.   What activities or movements make these symptoms worse (give examples)?

     **Walking on uneven surface's (sic)[,] staying on feet or walking for any len[g]th of time[,] carrying any weight over 10 lbs puts more pressure on heel and ankle causing severe pain.** (Tr. 86.)

6.a. List any side effects you have from any of your medications.

     **Drowsey** (sic)**.** (Tr. 86.)

9.   Do you take care of a spouse, children, parents, or animals? **Yes** What kinds of things do you do for them?  How old are the person you take care of?

     **Water the cows[:] Four cow's** (sic) **and one bull.** (Tr. 87.)

11.  Since you have become unable to work are you able to do the following:

     | | |
     |---|---|
     | Laundry | **Yes** |
     | Dishes | **Yes** |
     | Make beds/change sheets | **Yes** |

10

```
Iron                          No
Vacuum/sweep                  No
Take out trash                Yes
Home repairs                  No
Car maintenance               Yes
Mow lawn                      Yes
Rake leaves                   No
Gardening                     No
Banking                       Yes
Go to post office             Yes(Tr. 88.)
```

28. Is there anything else that you would like to explain about your condition?

   **In cold or damp weather my neck and foot give me pain[.]** (Tr. 90.)

In an undated claimant's recent medical treatment form, plaintiff reported, in part, new information from his doctors. The question and answer (answer shown in bold), in part, reflect the following:

(2) What have these doctors told you about your condition?

   **Explained what would be involved in a surgery (destroy 3 joints to repair one)[.] Both doctors recommended not to have surgery because of the risk of the skin not healing. Dr. McShane said to change my lifestyle to accomidate (sic) my foot, wear the brace, and learn to manage my pain pills.**

**B.   *SUMMARY OF MEDICAL RECORDS***

**1.   St. John's Regional Health Center**

On April 13, 2001, plaintiff went to St. John's Regional Health Center and reported left upper extremity pain to Mark Crabtree, M.D. He reported difficulty with

11

upper extremity pain for four months. The pain increased when sitting, but was relieved when standing. Positive Spurling's maneuver[3] was noted to the left. Plaintiff was diagnosed with cervical spondylosis[4] at C5-6. Dr. Crabtree recommended that plaintiff undergo a CT myelogram (Tr. 122-24).

On April 19, 2001, plaintiff went to St. John's Regional Health Center and underwent a cervical myelogram. The report showed effacement of the C6 exiting nerve root bilaterally, right worse than left (Tr. 134).

On April 19, 2001, plaintiff underwent a CT of the cervical spine. The report revealed that at C5-6, there was mild to moderate spinal stenosis and moderate neural foraminal narrowing bilaterally, right appeared to be worse than left. The nerve root sleeve was effaced bilaterally (Tr. 131).

On May 16, 2001, Dr. Crabtree from St. John's Regional Health Center wrote an additional letter in which he

---

[3]Spurling's sign refers to the reproduction or exacerbation of pain upon pushing down on the head and bending it toward the involved side.

[4]Cervical spondylosis is the degenerative joint disease of the cervical (neck) spine.  Stedman's Medical Dictionary, 27th edition, pp. 324, 1678.

12

reported that plaintiff suffered from cervical
radiculopathy, secondary to cervical spondylosis with
stenosis, and recommended that plaintiff undergo anterior
cervical diskectomy with arthrodosis and plating at C5-6
with decompression of the nerves bilaterally (Tr. 120-21).

On May 29, 2001, plaintiff went to St. John's Regional
Health Center and was admitted to the hospital for an
anterior cervical diskectomy with arthrodosis and plating
(Tr. 119).

On May 30, 2001, plaintiff was discharged from St.
John's Regional Health Center after the diskectomy (Tr.
119).

On July 10, 2001, plaintiff was examined at Medical
Imaging Consultation, and Dr. Thomas Sweeney opined that
there was no significant change in plaintiff's spine since
May 29, 2001, observing "[s]table appearing fusion at C5-6"
(Tr. 115).

## 2.    Gregory Hubbard, D.O.

On April 28, 2003, plaintiff saw Gregory Hubbard, D.O.,
and x-rays revealed comminuted calcaneus fracture (Tr. 197).

Medical records from Ozarks Medical Center of the same
date revealed that plaintiff fell to a cement floor. He
noted left heel pain, left wrist, elbow, hand, knee, ankle,

13

and foot pain. He was taken to the emergency room by stretcher with a splint on his left ankle (Tr. 189).

An x-ray dated April 30, 2003, from Gregory Hubbard, D.O., revealed comminuted three-part calcaneal[5] fracture of Sanders type II AB and Eastwood type II classifications (Tr. 187).

On April 30, 2003, plaintiff was treated by Gregory Hubbard, D.O. He reported pain in his left heel. Physical examination revealed swelling and tenderness to palpation about his heel. Plaintiff was unable to perform any weight bearing or strength exercises. He was diagnosed with left calcaneal fracture. Dr. Hubbard opined that plaintiff should have a CT scan (Tr. 167-68).

On May 5, 2003, plaintiff reported for a follow up with Dr. Hubbard. Dr. Hubbard noted that the CT scan revealed a significant valgus[6] alignment of the calcaneus with a fracture of the lateral wall associated joint. Dr. Hubbard noted that plaintiff's heel needed to be realigned if possible, but plaintiff was suffering from a large blood

---

[5]Calcaneal means related to the heel. Stedman's Medical Dictionary, 27th edition, p. 266.

[6]Valgus means bent or twisted outward away from the midline or body. Stedman's Medical Dictionary, 27th edition, p. 1926.

14

filled fracture blister. The doctor observed that:

> Patient has this decompressed and will follow up in 2
> days.  At that time hopefully we will be able to
> proceed with ORIF if this skin allows.  If it gets to
> be the end of next week and we still have not been able
> to proceed because of skin options, non-operative
> treatment will unfortunately be our only option versus
> an osteotomy at a later date.

(Tr. 165.)

On May 7, 2003, plaintiff returned to Dr. Hubbard. He
noted that his fracture blister was debrided and was no
longer filled with blood. He observed, "It looks like the
base of this is trying to heal."  He was told to return to
the clinic in five days and possibly have surgery. He was
given another prescription for Percocet[7] and a handicap
sticker (Tr. 164).

On May 12, 2003, plaintiff returned to Dr. Hubbard. The
proposed site for an incision for a calcaneus fixation was
comprised and surgery was not able to be performed. The
possibility of an osteotomy was noted for the future.  The
doctor observed:

> He and his wife seem to understand the implications of
> this.  Patient also knows the risks of proceeding with
> surgery now and having exposed hardware and possibly
> osteomyelitis and leading to an amputation, which I

---

[7]Percocet is a semisynthetic narcotic used to control
moderate to moderately severe pain.  Physicians' Desk
Reference, 54th edition, p. 1037.

have seen before.
Plaintiff was placed into a short leg cast (Tr. 163).

On June 23, 2003, plaintiff saw Dr. Hubbard and was converted to a boot walker. It was noted that plaintiff's calcaneus fracture was consolidating well, the skin on the lateral aspect of his heel was slowly healing, and there were not signs of infection. Plaintiff was told that it would be a long time before he would be able to return to normal activities. Plaintiff was told to expect more pain and swelling. Plaintiff was told that he will lose motion especially when walking on uneven ground because of the subtalar fusion after the fracture (Tr. 161).

On August 18, 2003, plaintiff reported for his follow up visit to Dr. Hubbard. Dr. Hubbard noted that his calcaneal fracture was healing and his subtalar joint was showing signs of fusion. Significant disuse osteoporosis was noted on x-rays. However, he had a good range of motion of his ankle joint. Persistent swelling distally into his foot was also noted. The doctor noted, "I explain[ed] to him and his wife, again, that this will be a lengthy process to obtain full healing of this, as well as, removal of the swelling, most likely 18 months after the fracture." The doctor also observed that plaintiff was not quite ready to

16

return to work activities, but added that "[w]e will review this when he returns in a month." The doctor also noted that plaintiff's skin was without erythema[8] or other signs of infection (Tr. 159).

On September 15, 2003, plaintiff returned to Dr. Hubbard, "approx. 4-1/2 months after this calcaneus fracture that was treated conservatively." Plaintiff's gait was slowly improving and swelling and discoloration was noted. Dr. Hubbard opined that plaintiff would still have a limp. Dr. Hubbard noted that Plaintiff's gait was slowly improving and that he only required crutches in unfamiliar territory. Finally, Dr. Hubbard observed that, "Hopefully we can get to the point where we can discuss him going to work" (Tr. 157).

On November 10, 2003, plaintiff returned to Dr. Hubbard. Plaintiff reported pain on the lateral aspect of his heel and down into his metatarsal[9] head. A valgus deformity of his heel was noted as was sub fibular impingement of his peroneal tendons. He was diagnosed with status post calcaneus fracture left and sub fibular

---

[8]Erythema means redness due to capillary dilation. Stedman's Medical Dictionary, 27th edition, p. 615.

[9]Metatarsal means related to the metatarsus or one of the metatarsal bones, i.e., between the instep and the toes. Stedman's Medical Dictionary, 27th edition, p. 1102.

17

impingement secondary to valgus deformity of the left heel. Dr. Hubbard opined that surgery could be performed to decrease his valgus deformity of his heel, however, plaintiff reported that he was not interested. Dr. Hubbard opined that he agreed, observing that "this is definitely something that could be done in the future" (Tr. 156). On returning to work, the doctor noted that "[plaintiff] has not been able to get a job at the repair shop for semis because of his inability to lift these heavy objects" and "[h]e is working to open his own garage, however, and use the education that he has obtained" (Tr. 156). In the patient's plan, the doctor indicated that plaintiff will "try to work on opening his own garage" (Tr. 156).

On February 23, 2004, plaintiff returned to Dr. Hubbard. Plaintiff reported pain in his heel and ankle after activities. Dr. Hubbard opined plaintiff's pain was due to the valgus alignment of his heel and the stress placed on the soft tissues. Discoloration of the skin was noted. Plaintiff continued to walk with an antalgic gait. Dr. Hubbard suggested that plaintiff obtain an AFO[10] to help eliminate the pain (Tr. 154). Dr. Hubbard stated that he

---

[10]AFO means ankle fixation orthotic. Medical Abbreviations, 8th edition, p. 22.

did not believe plaintiff should consider going on long term disability for this problem, and thought that the AFO brace would allow him to return to full work activities (Tr. 154).

## 3. Physical Therapy Clinic of Ava

On July 22, 2003, plaintiff went to the Therapy Clinic of Ava and underwent an initial physical therapy evaluation after being referred to physical therapy for pain in his left ankle and foot. Limitation of motion was noted in the left ankle as was the strength deficit of the left lower extremity. Difficulty walking without assistive device was noted (Tr. 150).

From July 22, 2003, to November 7, 2003, plaintiff underwent physical therapy approximately three times a week. His progress toward established goals was rated "good" and his response to the PT interventions were rated "good" (Tr. 135-49). The functional comments for September 10, 2003, summarize at least part of this treatment:

> 07/30/03. Patient ambulates with bilateral crutches using ankle brace. 08/06/03. Difficulty without bilateral crutches. 08/13/03. Continues to ambulate using bilateral crutches. 08/20/03. Ambulates using the straight cane without the left ankle brace for the first time. 08/27/03. Complaint of discomfort heel foot in walking using regular shoes using bilateral crutches. Continues to ambulate with bilateral crutches.

(Tr. 142.)

19

**4.    Patrick McShane, D.P.M.**

On May 26, 2004, plaintiff reported to Dr. McShane that the AFO brace provided 60% to 70% relief, but that he was still suffering from pain. He also noted that his heel would turn black, blue and purple with ambulation. Palpable pain was noted at the medial and lateral aspect of both ankles at the subtalar joint level. X-rays indicated joint space narrowing at the subtalar joint level and irregular articular contour of the same. He was diagnosed with degenerative arthritis due to the fracture rear foot and subtalar joint. Dr. McShane noted that even if plaintiff had surgery he would still have some residual pain, but stated that he "recommended that triple arthrodesis[11] is successful for getting rid of most of his pain" (Tr. 207).

**5.    Dr. Dale Wheeler**

On July 6, 2004, plaintiff went to Dr. Dale Wheeler at St. John's Medical Center, Ava, Missouri indicating that he "1) would like pain meds for his ankle[, and] 2) wants papers filled out for disability." Plaintiff noted that he had pain in his ankle and trouble with his hands. He noted

---

[11]Arthrodesis is the stiffening of a joint through operative means.  Stedman's Medical Dictionary, 27th edition, p. 149.

20

that his hands would go numb when he would write for too long. Left heel was misplaced laterally and tibia was medially displaced. Plaintiff was diagnosed with post left heel fracture and post left ankle fracture (Tr. 214-15).

## 6. Dr. David Paff

On November 24, 2004, plaintiff saw Dr. Paff for an examination "in regard to application for Social Security" (Tr. 218). Dr. Paff examined plaintiff and noted that he walked with a limp and wore a brace. He had a 4 cm decrease in circumference of the left calf at his mid-point as compared to the right. He had no ability to dorsiflex his ankle and had a lot of weakness in plantar flexion. Decreased range of motion was noted in all motions of the left ankle. Limited range of motion was also noted in the cervical spine (Tr. 219). Dr. Paff had "a few records, including a visit to Dr. McShane on June 15, 2004," a March 4, 2004, fitting for the custom plastic AFO, records from Dr. Hubbard, and a May 5, 2003, CT scan (Tr. 219-20). Based on this examination, Dr. Paff opined that it was unlikely that plaintiff could continue to work (Tr. 220). He completed a Medical Source Statement form in which he opined that plaintiff could lift and/or carry 10 pounds frequently and 15 pounds occasionally, stand and/or walk for 10 minutes

continuously and for one hour throughout an eight-hour day,
sit for one hour continuously and for seven hours in an
eight-hour day (Tr. 222). Dr. Paff indicated that plaintiff
could never climb, stoop, kneel, crouch, and crawl, but that
he could occasionally balance, reach, handle, and finger
(Tr. 223). Dr. Paff stated that plaintiff should avoid
extreme cold and heat, weather, wetness/humidity,
dust/fumes, vibration, hazards and heights (Tr. 223).
Finally, Dr. Paff concluded that plaintiff needed to recline
every four hours for 20 minutes, and observed that an
increase in pain medication could lead to a decrease in
concentration (Tr. 223).

## C. *SUMMARY OF TESTIMONY*

During the hearing, plaintiff and his wife testified;
and Michael Lala, a vocational expert, testified at the
request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff testified that he was born in 1956 (Tr. 243).

By way of education, plaintiff completed the 11th grade
and subsequently received a GED, and he can read and write
without difficulty (Tr. 243). Plaintiff had been attending
vocational rehabilitation but because of the accident that
led to his alleged disability, he has been unable to return

22

to school (Tr. 245).

At the time of the hearing, plaintiff was 5'11" and weighed 205 pounds, 15 pounds more than his normal weight (Tr. 244).

Plaintiff drives regularly and drove to the hearing (Tr. 244).

Plaintiff testified that his pain medication (Vicodin or hydrocodone)[12] makes him dizzy and drowsy, and causes him to have difficulty remembering things (Tr. 245).

Plaintiff testified that he became disabled on April 28, 2003, the date on which he fell off a ladder and shattered his heel and ankle (Tr. 246). His shattered heel and ankle make it difficult for him to return to work because he is unable to stay on his feet and because his injured foot swells and becomes black. He is only able to sit for a couple of hours must elevate his foot at the same time (Tr. 246).

Plaintiff testified that he is able to walk for fifteen minutes, or sixty to eighty feet, before he needs to sit down and rest (Tr. 248). He is able to stand for only ten to

---

[12]Vicodin or hydrocodone is an opiate medication used to control pain. Physicians' Desk Reference, 54th edition, p. 1502.

23

fifteen minutes at a time (Tr. 248).

Plaintiff testified that he is unable to move or bend his ankle. Cold and humidity make his ankle hurt more. Walking on uneven surfaces causes his ankle to hurt (Tr. 249). If he attempts to walk too far, too often, or for too long a time, his ankle pain increases (Tr. 250). Plaintiff also encounters problems if he sits too long without his foot elevated (Tr. 250).

According to plaintiff, the pain in his ankle is a stabbing pain that lasts throughout the day. The pain is more severe when he is on his feet (Tr. 250). Plaintiff rated the pain as a six on a ten-point pain scale. When he has been standing too long or walking on an uneven surface, plaintiff indicated that the pain elevates to a nine or ten (Tr. 251).

When experiencing pain, plaintiff takes a pain pill and elevates his foot (Tr. 251). He routinely elevates his foot for six and a half to seven hours a day (Tr. 251). When the pain becomes too severe, plaintiff indicated that he will take a pain pill and then nap. The pain pills make him sleepy (Tr. 252). Plaintiff is unable to drive after taking a pain pill (Tr. 252).

Plaintiff indicated that he wears a brace, which goes

24

from his foot to just below his knee, to correct his walking and assist his hip (Tr. 253). The brace has reduced the pain in his hip (Tr. 253). However, plaintiff's injured leg is smaller than before the accident. (Tr. 254).

Plaintiff testified that he may have to go through additional surgery in the future, but that the surgery would not resolve all of his pain and that he would have to go through the same pain he experienced when he first fractured his heel. Even with the surgery, plaintiff indicated that he would still be limited (Tr. 255).

In addition to heel pain, plaintiff indicated he is unable to return to work because of limited mobility in his head and neck (Tr. 246). Because of an injury sustained ten years earlier in a motorcycle accident, plaintiff stated that he is unable to look over his shoulder (Tr. 247). According to plaintiff, his neck cramps when he has to look down while in a sitting position (Tr. 247).

Plaintiff also testified that he experiences problems with his hands. He is unable to write for extended periods of time due to cramps in his hands (Tr. 256). This pain has been present since before his neck injury from the motorcycle accident (Tr. 256). According to plaintiff, his hand goes numb when he is writing (Tr. 257).

25

Concerning his physical limitations, plaintiff testified that he has problems bending over because he has to put weight on the injured foot that, in turn, causes increased pain (Tr. 259). Plaintiff also testified that he is not able to climb, push or pull (Tr. 259), because those activities cause severe pain in his foot and his leg (Tr. 260). Finally, plaintiff testified that he could lift only a couple of pounds at a time without causing increased pain (Tr. 260).

## 2. Mrs. Henderson's Testimony.

Plaintiff's wife testified that plaintiff is unable to perform outside work. (Tr. 266). She testified that she has witnessed him getting sleepy as a result of his medication, and has observed that it is hard for plaintiff to concentrate after he has taken his medication (Tr. 267).

## 3. Vocational expert testimony.

Michael Lala, the vocational expert, testified that a person of plaintiff's age, education and vocational history who suffers from degenerative disk disease and a stenosis, status post-cervical fusion, and status post-heel fracture with continuing ankle and heel pain who could perform sedentary work; would need to be in a climate controlled environment to avoid extremes of cold; should not climb or

26

be exposed to significant unprotected heights, potentially dangerous and/or unguarded moving machinery, or commercial driving; would need the ability to use an ankle orthotic device; would not be able to use safety shoes; would have to have foot gear of choice; could perform work that would involve walking on even surfaces only; should avoid exposure to extreme vibration; would need to avoid all pushing and pulling with the left lower extremity; would need work that was low stress with simple to detailed but not complex job instructions; and may be distracted by medical conditions and symptoms of his medical condition, would not be able to perform any of plaintiff's past work (Tr. 270). There would be a 55% erosion in the sedentary job base.

Mr. Lala opined that a person with these limitations could perform work as a charge account clerk or addresser (Tr. 271). The 55% erosion is due to a combination of all of the limitations (Tr. 271).

Mr. Lala further testified that if the person needed a sit/stand option and would have to change position every thirty to sixty minutes, the job base would be eroded by 70%, so 30% would remain (Tr. 272). The person could still perform the job of addresser, but not the position of the charge account clerk. The person could also perform the

27

position of hand mounter (Tr. 272).

Mr. Lala further testified that if the person would have to elevate the left foot at approximately eight to 12 inches, or foot stool level, on an as-needed basis throughout the day, the person would still be able to perform sedentary, unskilled work. However, if the person needed to elevate the left foot to the height of the heart or chest, the person would not be able to perform any competitive work (Tr. 273).

Mr. Lala conceded that the Dictionary of Occupational Titles ("DOT") does not address the sit/stand option or use of footstools. Similarly, the use of safety shoes is not addressed in the DOT (Tr. 275). Instead, Mr. Lala relied upon his professional experience for the bases of his opinions (Tr. 273-74), which included working in the field for twenty years, placing individuals in the job sites, doing job site surveys, analyzing the jobs and modifying the job sites for disabled adults (Tr. 274).

Mr. Lala also acknowledged that there is no guarantee that an employer would allow the use of a footstool in the workplace (Tr. 275).

Mr. Lala testified that a person--if unable to write or grasp a pencil or pen for longer than a few minutes at a

time--would be unable to return to plaintiff's past employment (Tr. 275) or perform any other work in the economy (Tr. 276).

Mr. Lala testified that if a person were unable to shift his head from side to side or to look above or below eye level on a sustained basis, that person would be unable to perform any of the positions he had described in his testimony (Tr. 276).

## V. FINDINGS OF THE ALJ

### 1. The Sequential Evaluation Process

The ALJ is instructed to undergo a five-step sequential evaluation process before determining whether a plaintiff is disabled.

The first step of the evaluation process requires the ALJ to determine if the plaintiff has engaged in any substantial gainful activity since the alleged date of onset. In this case, the ALJ concluded that plaintiff had not engaged in any substantial gainful activity since April 28, 2003 (Tr. 17).

The second step of the evaluation process requires the ALJ to determine whether the plaintiff suffers from any severe impairments. In this case, the ALJ concluded that plaintiff suffered from severe impairments of status post-

fractured left heel with continuing ankle and heel pain,
status post-cervical fusion and degenerative disc disease
and stenosis of the cervical spine (Tr. 18).

The third step of the evaluation process requires that
the ALJ determine whether any of the plaintiff's severe
impairments meet or equal a listed impairment found in
Appendix 1, Subpart P to Regulation No. 4. The ALJ
considered Listings 1.02, 1.04 and 1.06, but concluded that
plaintiff did not meet or equal any of the listings because
medical evidence did not show that he could not ambulate
effectively and there was no evidence of nerve root
compression, spinal arachnoiditis or lumbar spinal stenosis
(Tr. 18).

Before proceeding to the fourth step of the evaluation
process, the ALJ is instructed to determine the plaintiff's
residual functional capacity ("RFC"). The ALJ concluded that
plaintiff retained the following RFC:

> [A]bility to lift and/or carry up to ten pounds, stand
> and/or walk for two hours in an eight hour day and sit
> for six hours in an eight hour day; cannot work at
> significant unprotected heights, around potentially
> dangerous unguarded moving machinery, or do commercial
> driving; should work in a climate controlled
> environment that avoided extreme cold; be able to use
> an ankle foot orthotic device; requires an even
> surface, cannot wear safety shoes, but must wear foot
> wear of his choice and will need to elevate his foot
> eight to twelve inches when seated as needed; requires

30

> a sit/stand option at one hour intervals; requires low
> stress work which is simple to detailed work without
> complex instructions; cannot perform overhead reaching
> with both upper extremities or be around extreme
> vibration; and cannot push or pull with his left
> extremity.

(Tr. 20.)

The fourth step of the evaluation process requires the ALJ to determine whether the plaintiff is able to return to past relevant work, despite any limitations as noted in the RFC. The ALJ relied upon vocational witness testimony to determine that plaintiff could not return to past relevant work (Tr. 20).

Once the plaintiff has shown that he is not able to return to past work, the burden shifts to the Commissioner to show that the plaintiff is able to return to work which exists in significant numbers despite any limitations as noted in the RFC. The ALJ relied upon vocational witness testimony to determine that plaintiff could perform sedentary work such as that required in the positions of addresser and photo-hand mounter (Tr. 20).

## 2. Dr. Paff's Opinion

The ALJ did not give significant weight to Dr. Paff's opinions about physical restrictions for plaintiff or his future employability, because they were based on a one-time

31

examination and not supported by the overall record (Tr. 18).

### 3. Plaintiff's Credibility

The ALJ is required to evaluation plaintiff's subjective complaints, including complaints of pain, in accordance with SSR 96-7p and <u>Polaski v. Heckler</u>, 751 F.2d. 943, 948 (8th Cir. 1984).  Here, the ALJ found that the medical evidence and overall record did not support plaintiff's allegations of disabling pain and his inability to work (Tr. 19).

On the plaintiff's work record, the ALJ concluded that he had a "good work history," and therefore that factor presumably was held to accredit plaintiff's complaints (Tr. 19).  However, the ALJ also noted that the medical evidence and overall record did not support a finding that plaintiff was unable work, despite the finding of a good work history (Tr. 19).

The ALJ discredited plaintiff's subjective complaints because they were unsupported by the record, specifically:

> * Although plaintiff complained about restrictions involving his foot, Dr. McShane observed that plaintiff showed improvement with an AFO brace, Dr. Hubbard indicated that plaintiff could work with an AFO brace, and Dr. Hubbard observed reduced swelling in February 2004;

32

* Although plaintiff complained about pain, he refused to have surgery that might result in reducing the pain;

* Although plaintiff complained of physical restrictions, he was able to sit through the hearing, which lasted an hour;

* Although plaintiff complained about restrictions in his upper body, these restrictions were not supported by record; and

* Although plaintiff complained about disabling conditions at a level that would preclude all work, the medical evidence does not support such a conclusion (Tr. 19).

As to plaintiff's medications, the ALJ observed that plaintiff was prescribed hydrocodone, and that his continued use suggests that the medication was at least "somewhat effective in alleviating his pain and other symptoms" (Tr. 19). Concerning the side effects of the medication, the ALJ noted that although plaintiff testified that the medication made him dizzy and drowsy, he did not register these complaints with his doctors or seek a change in his medication regimen (Tr. 19).

Concerning plaintiff's daily activities, the ALJ observed that although plaintiff testified that he spent his days reclining in a chair and napping after taking his pain medication, he was regularly able to drive and use a riding mower (Tr. 19). The ALJ also noted that the medical records

33

do not support plaintiff's allegations of the need to lie down during the day (Tr. 19).

Overall, the ALJ concluded that the plaintiff is able to do sedentary work despite his impairments (Tr. 19).

## VI. CREDIBILITY OF DR. PAFF

Plaintiff first challenges the ALJ's evaluation of the evidence presented by David Paff, M.D., alleging that Dr. Paff's opinions are supported by medical evidence in the record; Dr. Paff is a specialist in occupational medicine whose opinions are therefore entitled to greater deference; and Dr. Paff conducted an extensive physical examination that is consistent with the overall record. In response, the defendant argues that Dr. Paff's opinions are not supported by the overall record.

A treating physician's medical opinion is given controlling weight if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); Choate v. Barnhart, -- F.3d --; 2006 WL 2321140 (8th Cir., Mo., August 11, 2006). These opinions are not automatically controlling, however, because the record must be evaluated as a whole. Reed v. Barnhart, 399

34

F.3d 917, 920 (8th Cir. 2005). The courts will uphold an ALJ's decision to discount or even disregard the opinion of a treating physician where "other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. at 920-21 (internal quotations omitted).

I find the ALJ's decision to discount Dr. Paff's opinions is warranted for a number of reasons. First, although Dr. Paff lists his business as "Doctors Occupational Medicine," there is nothing in the record to support the conclusion that by experience, education, training or certification, Dr. Paff's opinions should be accorded any greater weight than those of any other consulting physician. He appears to be a medical doctor, nothing more or less. Second, Dr. Paff's November 24, 2004, letter opinion acknowledges that he reviewed "a few records," not the entire medical record that was ultimately before the ALJ. Third, while Dr. Paff examined plaintiff, this examination appears to be limited to a simple physical examination and general observations (e.g., vital signs, Spurling test). Fourth, although Dr. Paff concludes that plaintiff will not likely be able to return to work, there

35

is no analysis or discussion of the factual findings that led to the doctor's conclusion.

Given these shortcomings, I find that Dr. Paff's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the case record. Therefore, I find that the ALJ did not err in not relying on the opinions of Dr. Paff.

## VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Second, plaintiff complains that the ALJ did not properly compute plaintiff's residual functional capacity based on the overall record. In response, the defendant argues that the residual functional capacity arrived at by the ALJ is supported by the record and, in fact, is largely consistent with the findings of plaintiff's consulting physician, Dr. Paff.[13]

In determining a claimant's RFC, "the ALJ must consider the effects of the combination of both physical and mental impairments," Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005); Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004).

---

[13]See Dr. Paff's medical source statement dated November 24, 2004 (Tr. 222-23).

The ALJ considered the effects of the combination of plaintiff's impairments and concluded that plaintiff had the RFC to:

> [L]ift and/or carry up to 10 pounds, stand and/or walk for 2 hours in an 8 hour day and sit for 6 hours in an 8 hour day due to his foot disorder. Due to possible decreased mobility and side effects of medication, the claimant cannot work at significant unprotected heights, around potentially dangerous unguarded moving machinery, or do commercial driving. He should work in a climate controlled environment that avoids extreme cold. Due to his foot disorder, he uses an ankle foot orthotic device as needed. The claimant requires an even surface and cannot wear safety shoes, but must wear foot wear of his choice and will need to elevate his foot 8 to 12 inches (the height of a foot stool) when seated as needed. The claimant requires a sit/stand option (in place) at one hour intervals. Because of possible distraction from his medical conditions and pain, the claimant requires low stress work which is simple to detailed work without complex instructions (i.e. would allow semi-skilled work). He cannot perform overhead reaching with both upper extremities or be around extreme vibration secondary to his cervical spine impairment. The claimant cannot push or pull with his lower left extremity.

(Tr. 20.)

I find that the ALJ's RFC assessment is supported by the record.  For example, on his ability to lift and carry, there are no medical records showing limitations to plaintiff's upper body that would preclude him from lifting ten pounds.  Indeed, plaintiff's March 14, 2004, answers to agency questions indicated that he could not carry <u>over ten pounds</u> because it put pressure on his heel and ankle causing

37

pain (Tr. 86); and even plaintiff's physician, Dr. Paff, indicated that plaintiff could lift and carry ten pounds frequently and 15 pounds occasionally (Tr. 222). The ALJ's conclusion that plaintiff could walk or stand for two hours and sit for six hours seems a conservative estimate given the following:

* Plaintiff's physical therapy records reflect a good response to therapy and good progress toward his goals (Tr. 135-50) and his treating physician's records are replete with references to the plaintiff likely returning to work after a lengthy convalescence, e.g., 18 months (Tr. 154, 157, 159, 161); and

* Plaintiff's description of doable tasks including watering four cows and one bull (Tr. 87), doing laundry, doing dishes, making beds, taking out trash, car maintenance, mowing lawns, and going to the bank and post office (Tr. 88).

On the need to elevate his foot 8 to 12 inches when seated, this limitation was taken directly from plaintiff's hearing testimony (Tr. 251) and, even if an accurate description of his limitation, it was not an obstruction to sedentary work according to the vocational expert (Tr. 272-75).

Given these and other facts, I find that the ALJ's residual functional capacity assessment is supported by substantial evidence in the record as a whole.

38

## VIII. *QUESTIONING THE VOCATIONAL EXPERT*

Third, plaintiff argues that the ALJ erred by placing too much weight on the testimony of the vocational expert, which was contradicted by the Dictionary of Occupational Titles. Specifically, plaintiff's complaint deals with the vocational expert's conclusion that plaintiff could perform work as an addresser and photo hand mounter which, according to the DOT, requires frequent reaching. Plaintiff argues that his limitations include an inability to reach overhead with both extremities. In response, the defendant observes that although the DOT is usually controlling when there is a conflict between a vocational expert's testimony and the DOT, in this case the vocational expert provided specific information based on his experience that plaintiff could perform such work in the economy, citing Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995), and Smith v. Shalala, 43 F.3d 45, 47 (8th Cir. 1995).

The DOT classifications may be rebutted when the vocational expert shows that "particular jobs, whether classified as light or sedentary, may be ones that a claimant can perform." Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995), quoting Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995). The vocational expert is

Case 6:05-cv-03327-REL   Document 16   Filed 08/14/06   Page 39 of 48

required to show that "jobs exist for someone with the [plaintiff's] precise disabilities." Montgomery v. Chater, 69 F.3d 273, 277 (8th Cir. 1995), quoting Jelinek v. Bowen, 870 F.2d 457, 459 (8th Cir. 1989) (emphasis in original).

Here, the vocational expert acknowledged that the DOT does not address the sit/stand option or the use of footstools.  Instead, the expert relied on his twenty years of experience in the field, including placing people at job sites, doing job site surveys, and analyzing jobs and modifying job sites for disabled adults (Tr. 274).

I find no error here by the ALJ in relying on this additional information, given the expert's background and experience, the bases for the expert's opinions,[14] and the absence of any significant cross-examination attacking the underlying foundation for these opinions.

## IX. *CREDIBILITY OF PLAINTIFF*

Finally, plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

_____

[14]Plaintiff's counsel raised no objection to the qualifications of the expert witness, Mr. Michael Lala (Tr. 268).

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant

41

factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion.

### 1. *PRIOR WORK RECORD*

The ALJ found that plaintiff had a good work record, and therefore this factor was held to support plaintiff's credibility (Tr. 19).

### 2. *DAILY ACTIVITIES*

As to daily activities, plaintiff complains that the ALJ made the following errors:

* The ALJ ignored the fact that although plaintiff uses a riding mower, he must take an hour break for every hour he mows.

* The ALJ relied on the lack of any treating physician's opinion that plaintiff was severely limited, yet the medical evidence contains repeated references from plaintiff's treating physician that his recovery would be a lengthy process.

42

     \*    The ALJ was critical of plaintiff for failing to avail himself of the use of an AFO, which would have allowed plaintiff to return to normal work activities, when this conclusion is unsupported by the medical records.

In response, the defendant essentially argues that plaintiff's statements concerning his limitations in daily activities are unsupported by the record.

Plaintiff testified that his disability is the result of a combination of physical ailments: his 1991 neck injury resulting from a motorcycle accident; numbness and cramps in his hands resulting from his 1991 neck injury from the motorcycle accident; and his 1993 broken heel and ankle suffered while undergoing vocational training (Tr. 246-57).

The medical records from plaintiff's treating physicians do not support the conclusion that any of these conditions, either singularly or in combination, result in plaintiff being disabled:

     \*    There are no medical records from the 1991 motorcycle accident;

     \*    There are no medical records indicating that plaintiff complained of or sought any treatment for numbness or cramps in his hands;

     \*    The 2001 records from St. John's Regional Health Center, dealing with plaintiff's cervical spondylosis at C5-6, reflect that plaintiff underwent a diskectomy and the fusion at C5-6 appeared stable (Tr. 115); and

\*     The medical records dealing with plaintiff's treatment for the April 28, 2003, fall, while acknowledging that recovery would be a lengthy process, are replete with references from plaintiff's treating physician that he would be returning to normal activities (Tr. 156, 157, 159, 161); and in addition, the final entry in the record from plaintiff's treating physician, Dr. Hubbard, observes that the AFO brace would allow plaintiff to return to full work activities (Tr. 154).

In addition to the medical records being inconsistent with plaintiff's testimony about his daily activities, the plaintiff has made earlier statements to the agency that are inconsistent with his claims at the hearing:

\*     When describing the medical conditions that prevented him from returning to work, plaintiff listed his "shattered heel and ankle" (Tr. 86) but made no mention of his neck or the numbness or cramping in his hands;

\*     When describing his capacity to lift, plaintiff indicated that "carrying over 10 lbs puts pressure on heel and ankle causing severe pain" but did not state, as represented at the administrative hearing, that he could only lift a couple of pounds (Tr. 260);

\*     When describing his daily activities on March 14, 2004, before the hearing, plaintiff represented that he cared for cows, did the laundry, washed dishes, made the beds, took out the trash, maintained the car, mowed the lawn, and traveled to the bank and post office (Tr. 87-88) but at the administrative hearing, held about seven months later on November 10, 2004, plaintiff testified that he could walk for about fifteen minutes or sixty to eighty feet before needing a rest (Tr. 248), his hands go numb when writing (Tr. 257), and he is unable to climb, push or pull (Tr. 260).

44

In addition, plaintiff successfully worked from 1991 until 2003 in a variety of positions requiring physical exertion with at least two of the three medical impairments that he now claims render him disabled (i.e., his neck injury and numbness and cramping to his hands).

This factor supports the ALJ's credibility assessment.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified that his pain in his ankle is a stabbing pain lasting throughout the day that he rates a six on a ten-point scale (Tr. 250).

Although plaintiff complains of disabling pain, there have been several options proposed to plaintiff to relieve the pain including the AFO brace that would allow him to return to work (Tr. 154) and triple arthrodesis, which would get rid of most of his pain (Tr. 207). While the medical records contain complaints of pain, there is no indication that plaintiff reported problems with his medication dealing with the pain to his treating physicians.

When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for

45

benefits. Id.; 20 C.F.R. § 416.930(b).

This factor supports the ALJ's credibility conclusion.

**4.   *PRECIPITATING AND AGGRAVATING FACTORS***

Plaintiff testified that precipitating and aggravating

factors include:

* Standing on his feet will increase the severity of
  the pain in his feet (Tr. 250);

* Walking on an uneven surface will worsen the pain
  in his feet (Tr. 251); and

* Activities such as climbing, pushing and pulling
  cause severe pain in his foot and leg (Tr. 260).

In response, the defendant notes that plaintiff's

complaints of pain and its limitations are not supported by

the medical records; the evidence shows plaintiff had

improvement in pain with the AFO brace; plaintiff's treating

physician opined that plaintiff could eventually return to

work with an AFO brace; and that two doctors (one treating

and another employed by plaintiff for a second opinion)

stated that surgery could reduce plaintiff's pain, although

plaintiff has resisted such surgical treatment (Tr. 207,

210).

The medical records support the conclusion that

plaintiff has experienced pain as a result of the heel/ankle

injury.  The records also show that he was progressing as

46

expected and was expected to experience more pain, but that after a lengthy recovery period, he could return to work (Tr. 154, 156, 157, 159). Specifically, on February 23, 2004, plaintiff's treating physician, Dr. Hubbard, suggested the AFO brace to reduce pain and opined that plaintiff could return to work with the benefit of such a brace (Tr. 154). Later, on May 26, 2004, Dr. McShane noted a 60% to 70% reduction in plaintiff's pain with the AFO brace, and opined that plaintiff could received additional pain relief with surgery (Tr. 207). Based on this information, I do not find that the ALJ improperly evaluated plaintiff's precipitating and aggravating factors in judging his credibility.

**5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

According to plaintiff's hearing testimony, he takes a pain pill and elevates his leg when the pain becomes problematic (Tr. 251). The pain medication makes him dizzy, sleepy, causes him to have lapses in memory, and renders him unable to drive while under its influence (Tr. 245, 252).

The ALJ rejected these complaints of side effects because there is nothing in the medical records indicating that plaintiff registered these complaints with his treating physicians or sought a change in the medication regimen (Tr. 19). My review of the medical records supports the ALJ's conclusion, and therefore I find no basis to conclude that the ALJ erred in evaluating the effectiveness or side

47

effects of plaintiff's medication.

**6.   *FUNCTIONAL RESTRICTIONS***

The functional restrictions have already been discussed above.   This factor supports the ALJ's credibility assessment.

**B.   *CREDIBILITY CONCLUSION***

Based on the above analysis, I find that the ALJ did not err in evaluating plaintiff's credibility under <u>Polaski</u>.

**VI. *CONCLUSIONS***

Based on all of the above, it is

ORDERED that plaintiff's motion for summary judgment is denied.   It is further

ORDERED that the decision of the Commissioner is affirmed.

```
    /s/
```
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 14, 2006